I apologize. That was the longest five minutes in history, but my wife will tell you that's my standard five minutes. I'll be right with you. Next case is Thompson v. Serot 5-16-0508. And Mr. Papa, if you're ready. Good morning, Your Honors. May it please the Court, counsel. Your Honors, this morning we're going to be discussing basic tenets of civil practice law and how the litigants involved in these cases are entitled to equity and fairness as best the courts can provide. Now, certain rules and regulations have been developed by the courts and the legislature that apply to certain types of cases, particularly in the field of medical negligence. In the field of medical negligence cases, a plaintiff is not allowed to even file a claim with the court until such time as he or she has secured the efforts of a professional to review the records that were involved in the care provided to the patient. That would presume that the records are full and complete. But in this case, you're going to hear about a circumstance where allegedly the record was not complete. I think that's been conceded. This involved a pretty straightforward, simple one patient, one doctor case. The patient being my client, Mr. Thompson, who had a history of osteoarthritis in both of his knees. Back in 2003-2004, he began consulting with Dr. Surratt, an orthopedic surgeon from Belleville at the time. Mr. Thompson was also from the St. Clair County area. Dr. Surratt does surgery on his right knee, a partial knee replacement, a year later does a full knee replacement on the right knee. No issues, no problems. About a year later, because of continued complaints in the left knee, Dr. Surratt is consulted by Mr. Thompson about another surgery, this time to address the problems with his left knee. Dr. Surratt discusses the situation with him, agrees that an elective procedure of a knee replacement would be fitting in this particular circumstance, and Mr. Thompson opts for the surgery. In fact, Mr. Thompson said he had no problem with the first surgeries that Dr. Surratt had performed and was willing to undergo the second procedure or have the second leg worked on. Under these kinds of circumstances, patients that go to doctors, particularly for elective procedures, put their faith and trust in that physician. These patients are not able to treat themselves. They don't have the knowledge, they don't have the expertise, they don't have the training. So they go to a person who is trained to do these things. In this situation, the faith that Mr. Thompson puts in Dr. Surratt is a blind faith because Mr. Thompson is not able to take care of this problem for himself. The trust that he puts into Dr. Surratt is a sacred trust because it's understood that this procedure is going to be done while Mr. Thompson is completely asleep, completely helpless, can't object, can't question, can't do anything. He's out. Now, it's anticipated that this procedure is going to take about an hour, maybe an hour and a half. In fact, the procedure goes on for twice that time. And by the time we get to the deposition of Dr. Surratt, Dr. Surratt has no recollection of this particular case, at least as to the circumstances of the surgery. He does remember that he talked to Mr. Thompson and his wife after the surgery and explained to them that during the course of the surgery he did, in essence, three procedures. He implanted a prosthetic knee, decided after he had cemented that into place that it didn't feel right to him, so he explanted that knee and implanted another knee. But when it came time to dictate his operative note, the only thing that he dictates is the third procedure of implanting the replacement, if you will, prosthetic device. Now, there are different kinds of testimony and different kinds of evidence that are brought before several juries in this state. And keep in mind that these are lay people that are going to be asked to make the decision about liability and damages in any case of this kind. Lay people can only rely upon information they receive from expert witnesses, at least that's what they're instructed. Most people, in most cases, you've got auto accidents, you've got trips and falls, people can appreciate the circumstances, people appreciate because it's happened to them. But not everyone's gone through the procedure, not everyone is qualified to perform a surgery to a person's knees, particularly replacing a joint. Juries are typically exposed to evidence of photographs, videos, statements, things of this sort, what I would classify as tangible or concrete types of evidence, and that's readily understood by a civil jury, a lay jury. Occasionally, however, civil cases have what I'll term intangible evidence. Juries are given information that is presumptions, assumptions, and inferences. And they were given such information in this case because of the absence of this full and complete operative note. I noticed in looking through the three-and-a-half-day transcript that was generated at the time of this trial, on three occasions during the opening remarks, counsel for Dr. Surratt made reference to the fact that the three doctors are going to testify that in 10% of these knee replacement cases, follow-up has to be done and further surgery is performed. Because in this particular case, a year after the knee replacement, Dr. Surratt had left town, Mr. Thompson had gone to another orthopedic surgeon, and that orthopedic surgeon had replaced the work that Dr. Surratt had done, and Mr. Thompson had gotten along fine thereafter. But during that year, Mr. Thompson had continued complaints with his left knee. I'd suggest there are two critical facts that are extremely important in this case. First, Dr. Surratt did not have a specific independent recollection of what he actually recalled or did during the April 5, 2005 surgery. As he mentioned, it was one of hundreds, if not thousands, of knee replacements that he had performed over the course of his career. The other critical fact is that the operative note that he did prepare in this case absolutely did not comply with state regulation or hospital policies about what's supposed to be in these reports. So in the absence of the tangible evidence that was not recalled by Dr. Surratt or was contained within any record, I submit that Dr. Surratt's attorney focused on these intangible things. He asked the jury to presume or assume that this surgery was just like all the other surgeries that Dr. Surratt had done, and he was able to then testify that, well, this is what I normally did, so that's what I did in this case. And he did remember that after placing the first implant, he felt that it was not stable or it was shaky. It wouldn't work well for Mr. Thomas. In point of fact, he did not record that finding or observation in his operative note. I mentioned counsel referred to what I would suggest are these presumptions about how these cases have gone in the past on three occasions during his opening, and he also made reference to this again in the closing arguments. The jury was asked to accept this, these assumptions, these types of testimony for a fact. Counsel, is that in common? My experience, Your Honor, is that it's not the way these cases are generally presented when there are records to make reference to. I mean, certainly physicians are allowed to testify about their experiences, their skill, their training and the like, and their other types of experiences, but there's always some record that's concrete that one can look at and, you know, ask questions about, and there was no such record in this case. Dr. McMullen, the plaintiff's expert in the case, opined that at least when he did his replacement surgery about a year later, that he felt that the cuts made in this particular case in April of 2005 were not optimal and led towards the breakdown of the bone and the cement that was used to place the leg in. Again, one can extrapolate from that that once you cement one of these joints into place, they are stuck in place, and you've got to use saws and drills and hammers and chisels to get the cement out, get the replacement out before you can do further work. But the jury heard all of that. I mean, that witness testified. The jury did hear that. But what the jury didn't get to hear was the request that I had made that instruction 5.01 be given, which would allow me to then argue about the inferences that you can make that the doctor not making a record of this original implantation and extracting of the joint. And that would help to level the playing field. The defense is allowed to argue the presumptions and the assumptions that, you know, this was going to go the way all other surgeries have gone. But I was not allowed to argue that because of his failure to comply with legal requirements to have a complete note about this surgery, we couldn't draw any adverse inference from that. I couldn't argue an adverse inference, which is what 5.01 was adopted for, to allow parties who have been aggrieved by someone not doing their responsibility in filling out a form or preserving a record or presenting testimony that could be adverse, that you should presume that it is adverse. And that's what I think is what really is the crux of this case. It's the fact that these intangible arguments could be made by one side, but intangible arguments that I felt were appropriate and reasonable and fair were not allowed by the trial court. And the trial court gave his explanation saying, well, it would have just been cumulative from other evidence that was given. Primarily, it was all that. We don't give that instruction unless we can show that the doctor willfully failed to complete this operative note the way the rules require him to do. Or there was no way to prove willfulness on the part of the doctor. And there's no case whatsoever that requires that you prove the witness to be willfully avoiding something in order to give this instruction. We've cited the Graves v. Rosewood Care Center case that comes out of Madison County. Judge Hillel, in that case, allowed the instruction to be given. This was a case involving a nursing home claim in which a form that was supposed to have been filled out and typically would have been made a part of the record of the patient's chart was not there. And there was no distinction made whether it was ever created or not. They didn't know whether the form was ever created, but the judge concluded that it would be an abuse of discretion not to give the instruction to allow the plaintiff to infer this adverse weight to the failure to provide the report. If we don't allow the use of 501 in this kind of circumstance, what we're doing is giving a distinct advantage to the physician over the unconscious patient. And I would suggest to the court that that's not a position that this court would adopt. And, in fact, this court did approve the action of Judge Hillel in the Rosewood case to give the instruction, and we believe that the instruction should have been given in this case as well, and that we were detrimentally affected as a result. Thank you. Thank you. Counsel? Good morning, Your Honors. Karen DeGrant for the Defendant Appellee, Dr. Donald Srot. May it please the court? Counsel? Your Honors, I'd like to, at the outset, address quite directly a couple of the statements that Plaintiff's Counsel just offered to the court. The trial judge did not rule that there must be a willful hiding of a record or failure to disclose. Although the court did comment that there was no willful problem, the basis of the judge's ruling, both at the time of the instructions conference and in the post-trial phase, was that the information that the plaintiff contended should have been contained in the operative report appeared elsewhere in the records, in the medical records as well as in the testimony. So, therefore, the quote-unquote evidence in question was cumulative, and the case law is quite consistent that no 501 instruction will be given when the evidence that's being questioned is already in the record before the court, before the jury. In this case, the counsel also, I believe, does not correctly state the record in saying that this information about the first knee implant and the explant does not appear in the medical records. That's absolutely not the case. In fact, a basis for the judge's ruling was that that information was contained in the medical records in the implant explant log, which was marked as a trial exhibit, although counsel or the plaintiff did not include that in the trial record, and, therefore, this court should presume that that evidence supports the trial court's ruling, and it also was contained in Dr. Surratt's office notes. So I think it's important to correct this misconception that the evidence was not in the record. Of course, the plaintiff, Mr. Thompson, and his wife both agreed that they had been told by Dr. Surratt about this initial implant and explant. This is Ms. Thompson at the time of the surgery and Mr. Thompson right after the surgery. So although the plaintiff was given free reign, there was no argument that was barred, contrary to what counsel just argued. Plaintiff was given free reign to insinuate from the opening statements during Dr. Surratt's cross-examination and in the closing arguments, both during the initial presentation and the rebuttal, that Dr. Surratt was hiding something. That all was heard by the jury. In fact, the language used by plaintiff's counsel was, I think, far beyond what would be contained in a 501 instruction. 501, after all, does not require any sort of presumption. Counsel has argued, or at least in the briefs argued, that there's a burden shifting. That's not what 501 says. 501 says that the jury may, not most, may infer that the evidence, and in this case the evidence that plaintiff is talking about didn't exist, would have adversely reflected on the defense. But that simply wasn't the case in this instance. Counsel, so I guess opposing counsel, I guess he'd admit that some of this came up in the record, as you stated, but yet I guess he'd argue that his client was prejudiced by the fact that the jury did not get the instruction. The jury instructions carried a little bit more weight. I mean, that's what the jurors are supposed to rely upon, the laws given by the court. And therefore, the client didn't get that benefit, and therefore, that's the basis for his appeal, if I'm summing his argument up correctly. How do you respond to that? Well, I have two responses, Your Honor. One is that the Supreme Court in the Stutt case has recognized that even if, and in that case, it was determined that the instruction about the standard of care for a physician was not correctly communicated in the instruction, the argument and the evidence that was presented to the jury showed that there was no prejudice experienced. And so that certainly, although the instruction would have been one way for the jury to hear that, the jury in this case heard this and actually in a stronger presentation from the very beginning of the trial to the very end of the trial. The other, and perhaps a very important point that seems disregarded by plaintiff's argument, is the absolute lack of impact of including a reference in the operating report to the removal of the first knee on any kind of damage that was sustained by the plaintiff. Dr. McMullen, who did the subsequent surgery in 2006, conceded on cross-examination that he didn't review the operative report of Dr. Sarai's surgery before Dr. McMullen handled the subsequent surgery. So there's not one bit of evidence in the record that whether the operative report talked about the first implant, didn't talk about the first implant, that it had any impact whatsoever on the plaintiff's outcome. And therefore, even at the outset, the topic was irrelevant. And that's another basis that shows that there could not have been any prejudice. The plaintiff's sole expert, Dr. McMullen, did not testify in any way, shape, or form that there was any causal connection between the absence of the evidence or the absence of the reference that counsel is talking about in the operative report to the ultimate outcome for this patient. No relationship. Yet, it was a focal point of Plaintiff's case, even in the absence of this causal connection. The issue before the court is whether the trial court abused its discretion in concluding that this case did not present a missing evidence situation, and that the evidence in any event, according to the trial judge, was before the jury. Given the deferential standard of review in all of the case law, it seems to me that this court would have to break new ground in finding that there is an abuse of discretion. Now, counsel mentioned the Graves case, but misstated the ruling in the Graves case. That's a decision of this court. In Graves, there was no finding that there was an abuse of discretion on 501. And in Graves, contrary to what counsel argued, there was evidence that the report in question did exist, but wasn't produced. So that's a completely different situation, and it's a situation where, as we asked this court to do, the appellate panel deferred to the discretion of the trial judge. There was a statement at the outset of counsel's presentation this morning that the defense concedes that the record was incomplete or deficient, and that is simply not the case. There was no such concession. In fact, when counsel refers to the administrative regulations and to the hospital policy, the only testimony on that point was Dr. Surratt's testimony. And Dr. Surratt did not concede or testify that his reporting was in violation of any regulation, and the regulations that were cited were licensing regulations that pertain to hospitals. So it's not relevant in any case, and did not concede that the charting or the preparation of the operative report was in violation of any hospital policy. So that's certainly an important point for the court to consider, that there was no such concession. And the trial court carefully considered this issue. It was raised during the motions in Lemonet, and then the court also had done research and had argument with counsel at the stage of the instructions conference, and had reviewed the case law and came to the conclusion that there was, that the evidence that counsel was not in favor of this, was not in favor of this. The evidence that counsel was urging as part of the 501 situation was before the jury, so it's cumulative. And at that point, to the extent that there's a determination that evidence is cumulative, there's no need and it's not appropriate to give a 501 instruction. So the court can begin and end its analysis at that point, but if looking at the four elements for a 501 instruction, was the evidence under the party's control? That's the first question. No, the evidence didn't exist. It wasn't under anybody's control. Was the evidence equally available for both sides? It was equally unavailable because this operative report or this aspect of the operative report that plaintiff urges should have been the basis for a 501 instruction was not in existence. And under the circumstances, would a reasonable person have offered the evidence that's favorable? Again, I go back to emphasize that this information was before the jury. It was before the jury in the medical records, the implant expert law, and Dr. Surratt's office records, and in the testimony, including the testimony of the plaintiffs. And that's really an important point as far as the case law, because there is not one case that was cited by the plaintiff or that I could find that says when there's a concession that evidence does not exist, somehow 501 is an appropriate instruction. There's no case that says that. In fact, the cases say, and this is the Anderson case of the first district that we cited in our brief, the fact that evidence doesn't exist is a reasonable excuse for not producing it. So that takes care of the fourth prong of the 501 threshold elements. The plaintiff seems to be asking this court to rule that a 501 instruction is mandatory whenever a party claims that a medical record or any report or document is lacking. Somebody finds fault with it. Nobody did in this case. There was no testimony at that point, by the way. But where does the court draw the line? I can't conceive of how the court would draw that line and find that the trial court here abused its discretion. And in any event, the court has touched on the issue of prejudice, and I think it's very clear there's no prejudice. There wasn't any statement, no cross-examination, no argument to which the defense objected on this point of the plaintiff's theory that there was some sort of hiding of the evidence or Dr. Sarra was trying to cover up a mistake that he made. Clearly he wasn't trying to cover anything up, otherwise he wouldn't have had those discussions with the plaintiff and put it in his office notes. But be that as it may, there's not one statement or author of proof, anything of that nature, that plaintiffs can point to and say, I was stopped from making that argument. I was stopped from asking those questions. What the jury didn't hear is that you may, you may, not must infer that this evidence would be adverse, but certainly the extensive questioning of Dr. Sarra, the statements that were made during the openings, and the very specific argument during the closings, both initial and on rebuttal, made it clear that plaintiff's position was that there was no evidence. Dr. Sarra was trying to hide something, and this simply was not convincing to the jury. Very quickly on the plaintiff's contention concerning the manifest weight of the evidence, Mr. Papa referred this morning to testimony of Dr. Sarra, and I have to correct his description of the testimony. He did not say that he had no recollection of this particular case. He didn't testify to that in his deposition. He didn't testify to that at trial. What he did say was he did not have a recollection of the specific cuts that were made. That's different. He did, and of course he can testify based on his custom and practice to the cuts, and that's what he testified to at trial. He did have a recollection of the case generally speaking, and of the surgery generally speaking, because it was a situation where he had implanted the knee and then had to explant it, but there was no statement by him that he didn't recollect, and then all of a sudden he did recollect. In any event, the jury heard all of that, and of course the jury decides whether a party's testimony is credible, whether it's consistent. The jury, the plaintiffs were not prevented from attempting to impeach Dr. Sarra with his deposition testimony. So that's no basis for a manifest way challenge. The other manifest way challenge that plaintiff focuses on in the brief was whether the expert for the defendant, Dr. Rendy, gave speculative testimony, and I believe that this court would have to overrule Wilson v. Clark in order to make a determination that Dr. Rendy, whose qualifications were never challenged, whose the admissibility of his testimony was never challenged, that he couldn't rely on medical records and he couldn't rely on Dr. Sarra's deposition testimony to reach his conclusions. The fact that, as plaintiffs argue, that Dr. Rendy didn't personally see the knee, or that Dr. Rendy didn't have access to an operative note that contained this other information, is not a basis for challenging the evidence that was before the jury. And certainly to the extent that plaintiff seems to be suggesting that the only competent expert in a medical case is a subsequent treater, there's certainly no legal support for that position. So I would also observe that Dr. Rendy's causation testimony was given and isn't challenged by the plaintiff, and that, along with Dr. Sarra's standard of care testimony, more than adequately supports the defense verdict. I don't believe that the 501 issue or the challenge to the manifest rate of the evidence calls for this court to find that there was an abuse of discretion or any need for a new trial. Is there any question I can answer for the court? Thank you very much. We ask the court to affirm the judgment. Thank you. Your Honor, I will ask the court's indulgence to take a look at page 5 and 6 of the defendant's brief. And after reviewing that portion of the brief, which contains nothing but speculative statements about what happened during the surgery involved in this case, that's what I would ask the court to do. The plaintiff in this case was up against in this case. A physician who does not record this information puts his patient victim at, it makes it impossible for him to follow the case. Counsel is correct, there was no objection to my argument in the case, because I never argued that the jury had the right, if they choose to do so, to infer an adverse inference from the failure to provide this information to them. That's why there's no objection, because I follow the court's ruling. I did not argue the principles of 501, which I think put my client at a distinct disadvantage in this case. Clear disadvantage. Unless Judge Rothenow was somehow thinking that he had to find Dr. Surratt willful or intentionally failing to create this record, I don't know why he would make those references in explaining his ruling to us on my motion to eliminate and on my request to introduce 501. Plaintiffs have to be given an opportunity to present their case as fully as they can. 501 would have allowed me to do that, I believe, much more so than I could without the authority of that instruction behind me. What that instruction says is that the jury is empowered to reach a conclusion that may be adverse to a party if that party doesn't produce something that they're supposed to produce, or that they would have produced had it been favorable to them. That's what that instruction's all about. All of the principles of 501, 1 through 4, are satisfied in this case, every one of them. That instruction should have been given. That instruction was not given. I would suggest to the court that the court should not think otherwise. That instruction can make a difference when an advocate is armed with the power of an adverse inference. That's what we were looking for in this case. That's what we were denied by the trial court. That's what authorizes this court to give us another opportunity to present this case on behalf of Mr. Thompson and compensate him for the injuries that he sustained. Thank you both very much. Thank you, counsel. We'll take this under advisement. Issue a ruling, of course. We're going to stand in recess for truly about five minutes just to bring in our other member. I should mention at the onset of this case that Judge Moore will be sitting in this case as well. Due to an illness, he was unable to be here today. This was his only case. Thank you. All rise.